Our next case on the call of the docket is agenda number 15 case number 1 1 4 8 1 7 a rate and Ray the Parentage of J.W. Minor Council for the appellant please proceed. Thank you. May please the court counsel your honors. My name is David Sotomayor and I represent Jason Wills who's the appellant in this case and who's present here in court. The issue in this case is what is the proper burden of proof in actions brought pursuant to the Parentage Act. This court has stated in the case of J.S.A. that even though a paternity may be established upon the filing of a petition pursuant to the custody or the right to have visitation with the child shall not be granted unless it is in the child's best interest. Now I'm sure your honors are aware of the particular facts in this case. In this case J.W. at approximately the age of six and a half years of age is when the biological father, a person by the name of Steve Taylor, initiated this case by the filing of a paternity action for determining the parent-child relationship with J.W. The fourth district in its decision stated that Section 607A of the Marriage Act is the relevant standard to be considered whether visitation is sought under the Parentage Act or the Marriage Act. And what the fourth district court, appellate court, did is said that Section 607A essentially is the standard to be used in deciding whether or not a petitioner is going to be afforded visitation. Now that goes contrary to what this court has said and in J.S.A. and also in, I believe, in Ray, the matter of John M. And that is that the simple filing of a petition and even a fining of paternity does not automatically confer visitation rights on that Now when I filed my brief, the case of Wittendorf v. Worthington had not yet been published. And I believe that case is cited in some of the amicus briefs that your honors have had from the various individuals who have sought leave to file those briefs. And the interesting thing about that Wittendorf v. Worthington case is it's a fourth district case. And it involves, well, it was concurred in the opinion by two of the same justices who wrote the in Ray or concurred in the in Ray J.W. case. And in that case, which I believe came out in November of 2012, the fourth district appellate court says that they find that section 14A1 of the Parenthood Act incorporates section 602 of the Marriage Act and not section 607 of the Marriage Act, which has done, in my opinion, a complete reversal in saying, well, wait a minute, it isn't 607 that applies, it is simply 602. And 602 under the Marriage Act says that it's the best interest of the child that is the paramount consideration that must take place in deciding whether or not visitation occurs. Now, I've had time to reflect upon the opinion of the fourth district and the initial assessment by them that 607A is applicable simply because we're talking about visitation. But when you really look at 602, I'm sorry, at 607A and you read it, it says a parent not granted custody of the child is entitled to reasonable visitation. Well, Your Honors, when I thought about that, I said, well, how is that applicable? Because what the Parenthood Act says, it says the relevant standards of the Marriage Act. Well, the relevant standards of the Marriage Act would pertain to that petitioner's request for visitation, not custody. 607A comes into play when you have two married individuals who are now deciding, pursuant to a dissolution of marriage, who is going to have custody of that child. Is it going to be the mother who has, is it going to be joint custody? Is she going to have, be the residential parent? And if so, then under the provision of 607A, it says, well, then the other person, whether it be the male, whether it be the father or the mother, is then automatically going to be entitled to visitation unless you can show a serious risk of injury. Now, if you take this and look at the Parenthood Act, when was Steve Taylor ever a litigant with respect to custody? He wasn't. He simply injected himself into this case after custody of J.W. had already been determined. Some six and a half years after the birth of the child, he first places himself in this case. And under the standard at that time, and the standard that I'm saying is applicable here, it would have been his burden to show by a preponderance of the evidence that it was in the best interest of J.W. at that time that he be allowed visitation. But what the Fourth District does by now changing the rules and saying that 607 applies, it then doesn't place the burden upon him, it places the burden upon my client, Jason Wills, to say, wait a minute, now I have to show how his presence would seriously be a serious risk of injury to Jaley. Why should the non-moving party be thrust upon a higher burden of proof when he hasn't done anything? So the rationale of the Fourth District with respect to creating this additional burden upon the non-moving party, I don't think is appropriate. And when, and this Court has never addressed the issue, even though you have the JSA case, in re John M., it really hasn't addressed what is the proper burden of proof. I submit to you that when you look at the statute, the Parentage Act, it talks about the relevant factors. And the courts, or the Fourth District, seem to say, well, relevant, we're really talking about standards. But the legislature Can I interrupt you here? Yes. This seems to be a case of statutory interpretation. Would you agree with that? I would agree with that. I would agree with that. And it certainly seems that the word that the Court, the Fourth District was struggling with, is this word relevant, relevant factors. So what kind of statutory construction tools could you suggest to us as to how we should interpret the word relevant as it's used in Section 14? Well, Judge, I mean, sorry, Your Honor, the first thing that I did when I looked at that word relevant is I went to the dictionary. Because that's what we're talking about. And the word relevant, I believe it was whether it's applicable. So certainly the choice of the word relevant wasn't just thrust in there or put in there for no reason at all. Because if you look at 607, and you look through all the sections of it, you are only, really, the Parentage Act says, look to the relevant standards. So how would, the applicable ones, so how would 607A be relevant or applicable when this isn't a case involving custody? At no time did Steve Taylor present a petition seeking custody of J.W. Now, let me tell you how that could have occurred. Under the facts of this case, there was already a mother and a father that had been euthanized. And there was a mother and a father that had been officially recognized. The issue of custody had already been decided. So 607A does not become applicable to Steve Taylor unless, this was a situation where you had an unmarried woman, let's assume that Amy had never become married, that she was raising J.W., and let's say for whatever reason she was an unfit person. Steve Taylor would have had the opportunity to come in, file not only a petition for visitation, but also once his parentage had been established, he could have moved in for custody, challenging the fitness of Amy. But in this particular case, what we have is the issue of custody already had been decided. So then 607A is not relevant or applicable in these proceedings with respect to visitation because it has no bearing whatsoever on his petition for simple visitation. You're going to have to help me with your argument. Section 14 says the judgment, this is the guaranteed judgment, shall contain or explicitly reserve provisions concerning any duty or amount of child support and may contain provisions concerning the custody and guardianship of the child, visitation privileges with the child, the furnishing of a bond or other security for the payment of the judgment, which the court shall determine in accordance with the relevant factors set forth in the Illinois Marriage and Dissolution of Marriage Act and any other applicable law of Illinois to guide the court in a finding in the best interest of the child. In determining custody, joint custody, removal or visitation, the court shall apply the relevant standards of the Illinois Marriage and Dissolution of Marriage Act, including Section 609. So just, if we could just start with how are we to interpret that statute? There was a judgment in this case, correct? The parentage judgment? There was a judgment, but there was a judgment as it related to Amy Wills. No, I'm asking about Steve Taylor. Was there a judgment as to parentage as to Steve Taylor? There was a finding, there was a finding that he was the biological father of Amy Wills. Significant enough to invoke Section 14 of the Parentage Act? Yes. Okay. And then the statute says that after that judgment's been entered, then the court may enter all of these orders, including visitation. Correct. Including custody. And in order to do that, the court should use the relevant factors in the Marriage and Dissolution Act. So I'm not saying that I'm not sure I, to me, I was kind of focusing on the words of the statute, and I'm not sure you really helped me figure that out. Well, Judge, because the court has the ability to address each of these issues, the support, the custody and visitation, doesn't mean that it automatically has to. And I think if you look at the, this Worthington case that I brought up, that was a case that was once again came out in November. Under those facts, the court entertained a petition for custody by the unmarried woman, I forget her name, she was the attorney out of Winnebago County, who had actually filed the petition to establish the existence of a parent-child relationship. And there, the issue of custody was addressed, and she, I believe, filed the petition. Was awarded custody. So in that instance, that is something that was combined with the paternity action. In this case, we don't have that. In this particular case, under these facts, the whole issue of custody has already been decided, and that was never, never addressed by Steve Taylor. So it isn't something that automatically, that each provision, even though the court has the authority to address it, it wasn't relevant to the case because it had already been decided. So did Steve Taylor file a petition for visitation rights? He filed the petition to establish a parent-child relationship. And in his prayer, asked for visitation. So once that had been determined, and we stipulated to that. I mean, there's no dispute that he is the biological father. But we have to, I mean, we have to, we have to recognize, I think we all have to recognize the fact, what was the Parentage Act created for? And we're talking about, you know, Steve Taylor and his rights and everything else that it had. But really, the focus, the focus is on what is in the best interest of Jaylee. The only, the purpose of the Parentage Act, as your honors are aware, is not for the benefit of Steve Taylor, Jason Wills, or anybody else. It's focused on the child. You know what, we want to make sure that the child has support, that he has not just the monetary support, but any emotional support that comes from the existence of this relationship. I'm sure that it didn't contemplate, as in this case, that we have technically two legal fathers. And there was never any action brought by Steve Taylor, they could have done it, to try and have a child. And this established Jason Wills as the father, and Jason Wills is the father. And fatherhood isn't something defined strictly by genetics. He is the father, and continues to be the father. So now, we have this kind of anomaly here, where this other individual wants to come in and simply interject himself. Well, what about the father? What about the father? What about the father? What about the father? What about J.W.? Simply because he wants to do this, and he say that he should be afforded this, and this is what the standard should be, the focus still has to be, as your honors have stated in JSA, let's look to see what is in the best interest of the child, regardless of anything else. And doesn't the statute direct the court as to how to make that determination? Statute says, which the court shall determine in accordance with the relevant factors set forth in the marriage and dissolution marriage act, to guide the court in a finding of best interest of the child. So I am kind of back at, what does relevant factors mean in the statute? Well, as I indicated before, and I think, even if you look at some of the cases that Mr. Martinkus has cited, and I believe one of those is, I think you can just give me a minute here. Well, let me just go back to the Worthington case, because they address that same issue. The relevance to relevant standards makes it clear that not every rule a court would apply to a parent in a dissolution of marriage case applies with equal force to a parent in a parentage case. So, even the 4th district has acknowledged that simply because they talk about relevant standards, that we're not going to go through each one of the standards set forth in the marriage act and say they automatically get applied to an action brought under the parentage act. So, to address your honors question, how you should consider that, they themselves, in the opinion, say that everything under 607 applies with equal force to a parent in a parentage case. But 607 does not automatically mean that it becomes relevant or applicable. So, how should your honors look to it? Look to each of these, and look to the interpretation that the 4th district appellate court has said, and that is that it's 602 of the marriage act that is really the focus that has to be undertaken or considered with respect to visitation. And that talks about the best interest. And getting to the best interest, what had happened here is the trial court, Judge Karen Wall, I believe, is the one who listened to all the testimony, the testimony from the experts, from the doctor, who, and the thing is this, I look at the opinion and it says, well, he was denied visitation. He wasn't denied visitation. Visitation was essentially reserved. And what the judge said is, I want on an annual basis for there to be an evaluation of this child. Because at the time that this action was brought, the child was not in a position to recognize Steve Taylor as her father. Now, we're talking about, at that point, the trial was a 9-year-old child. A child who, Mr. Sotomayor, time. I'm sorry. Thank you. Good morning, judges. My name is Jim Martinkus and I represent Steve Taylor, who is the legal birth father of this child. Justice Steeves, let's get a couple of things straight, because you asked some good questions, but I don't think the answers really state fully what was stated. If you look at the appellate opinion, at page 3, the court finds, in addition to the establishment of paternity, Steve asked for joint custody of J.W. and visitation. And at page 4, the appellate court opinion states clearly, on September 9, 2009, in the consideration of J.W. and visitation, J.W. was denied visitation. And at page 5, the appellate court opinion states that the trial court entered an order of parentage as to Steve. It wasn't just a finding. Counsel suggests that the language in 607, because it makes reference to, quote, a parent not granted custody, that that somehow wouldn't apply to someone who didn't fight for custody. I don't see any distinctions there whatsoever. I think that language under 14A1 clearly is the language that's relevant. If you're talking about visitation, and again, Your Honor, I quote in my brief, the Gines case, the Gines v. Juror case clearly states, quote, the parentage act makes no distinction between the standards for these issues in parentage cases and those in cases where a marriage is dissolved. And that's exactly what you have here. A trial court is not taken away from its position to determine best interests. Your rulings in cases involving best interests don't disappear because this is a parentage case. The court has to look at the best interests of the child, but the court must look at the relevant factors set forth in the Illinois Marriage and Dissolution of Marriage Act. There are two factors that clearly are shown in 602 and 607. Those are the actual statutory language, the sections in the Divorce Act, that deals with these issues. How could they not be relevant? Mr. Martinkus, I note that when Mr. Sotomayor, I believe his analysis includes that section 14A1 of the Parentage Act references section 602 of the Marriage Act, not section 607A, and that's what, you know, the heart of this argument is. I agree. And he references the John M. and J.S.A. case that although they don't point to which provision, 602, 607, I know you agree, do mention best interests in our opinions. In the face of that, you respond with two appellate court cases. I really haven't seen your argument as to John M. and J.S.A. I don't think the opinions that you have And by the way, the appellate court cases predated our Supreme Court cases. I understand. Correct, Judge. I don't read those cases to say that in determining best interests, you have to avoid the mandates of 607. I really don't. I simply see those cases as saying in these cases, like all cases involving kids, you have to determine what is in the best interests. It may very well be a different set of factors if you're looking at someone who's not been involved in a child's life. Steve Taylor did everything right the moment he found out that this was his child. My God, I have a child, I have a daughter. He becomes involved in this child's life, he files petitions, he does everything he can. So this isn't a case where he knew about it or had any reason to suspect that Judge Marchinkus, did he file a petition for custody? He filed a petition to establish Like Mr. Sotomayor said, in the prayer for relief, he asked for visitation. Did he ask for custody in the prayer? I don't want to mislead the court because I'm not 1,000% sure. I wasn't the original attorney, but I do believe that what counsel said is correct. He filed a petition to establish him as father, and within that prayer asked alternatively for either joint custody, visitation, and the like. But it certainly was all contained within that pleading. There's no question that he went to court to establish himself to have the trial court determine that he was the father. But Justice Thomas, just again, trying to go back to your question I don't think for a moment that I'm suggesting to you that best interests as set forth in these opinions is such that you can't use 607. Maybe that's what this court meant, but I don't think that's what it said. 607 talks about looking at a situation where why shouldn't a child, why shouldn't any child? Let me just stop you. The reason it's important, right, is I think Mr. Sotomayor mentioned it as well, where the burden falls, right? Absolutely, right. And 602 does say best interests. Is it your argument that physical, emotional, moral, or emotional health encompasses the best interest standard? Is that the gist of it? Well, I don't think, yes, I think that when a court looks at best interests the court looks at all those factors, but I think that the way the structure of the statute works is that you should presume it's in a child's best interest that, in fact, they have a relationship with their parent. Where there's the legal parent as established by a court order, where there's the biological parent. That should be the presumption. In fact, that's what 602 talks about. 602 talks about the court shall presume that the maximum involvement and cooperation of both parents regarding the physical, mental, moral, and emotional well-being of their child is in the best interest of the child. So with that regard to 607, you have under 602 a presumption that it's in this child's best interest that you maximize the contact. I do think it should be on the burden on someone else. Mother's not here contesting this. This is the legal father who's contesting this. It should be upon the person contesting it to show how does this visitation that our legislature says presumes this is in the best interest of the child. Jaylee, the child here, isn't going to care about all these different labels we're putting on people. Oh, this is her biological dad. This is her legal dad. This is her stepdad with Mr. Merrill. This child's going to be concerned with whether or not someone in her life shows her love, affection, attention. That's what this is about. And this is why I think if you look at these particular statutes, it does give the court the opportunity to look at all these things. We're not going to look to see what we label a parent or a step-parent or a legal parent. How does this child react? You have to remember, too, the unusual part about this is Steve has a relationship with this child. If you look at the exhibit, just 30 or 40 pictures of these two together hugging each other, all these things, it's pretty remarkable that one could conclude that she doesn't know. There's an email clearly where they talk about sitting down with her, talking with her. Frankly, until the trial court's order at his request, at the legal father's request, in which no contact, you can't even contact this child. My client, Steve Taylor, had less rights than the janitor at the grade school who could go see this child put on the Christmas play. There was never any reason to do that. But so now then the question becomes, well, she didn't say anything about Steve. Well, yeah, because of a judicial fiat, he was removed from her life during the pendency of this. Mr. Martinkus, how do you address, if we get that part, Dr. Fry or Fray or whatever is pretty forceful in saying that the invitation should not be granted? Right, but judge, if you look at the reasons, I asked her very clearly. She bases it on Piaget and Erickson's 1950s and 60s theories of development of a child. None of it made sense because all of the things she testified about, oh, the possibility of confusion, bad grades, all these things, I asked her clearly, well, what about when the new stepdad came in? What about Mr. Merrill? Did you experience any of these things? No, none of these things. She had a brand new person's stepdad come in and she experienced none of these things. I mean, Dr. Fry basically said this is, and I asked her, do you have a simple fact, is there an ode of evidence to show that this was happening in this case? No, it's purely speculative theory, child development theory. Dr. Osgood testified, I'm sorry. What about, Mr. Martinkus, what about, what was the position of the guardian ad litem and what was that based on? Well, Mr. Mellon originally just took the position that he wanted to look at Dr. Fry and maybe go along with her. But as this case developed and then I think he realized that there might be an issue, because he found specifically that there was no serious endangerment, there was nothing that would indicate that. But as this case went along and I got involved and I filed pleadings and I argued burdens of proof, then I think at the end Mr. Mellon started adopting more of her position. But again, did Dr. Fry's position? I think so. In other words, he, I think at the end basically said, well, maybe this would be better. Dr. Fry never said that. And one other comment on this. I mean, the implemented attempt here of every year my client's not even involved, but we go to some psychologist to see if she knows anything more about her father. Is that realistic? Is that someone who's ever going to have visitation? I mean, that's not. How would this child ever become aware of the fact? Now, there's a reality check here. I can tell you this. She lives in a small town. Even after all this is going on, who's babysitting this child? My client's sister. So she's involved with all of this extended family except Steve can't talk to her or see her. I'll bet you any amount of money that if you go to the school, this kid knows who Steve probably is at this point. Kids talk, small town community. She goes and sees other people. Other people have said this. It's a real tough one because I represent a fellow who was thrilled. The only child thrilled that he's got a daughter and now he does everything he can. And he's the one that says, don't interfere with this guy's relationship. That's important. This is very important. He tries to respect everyone here and he wants to have some opportunity to have a relationship. He knows it may not be every other weekend. Whatever it might be, he's willing to take on. This isn't this child's interest. It isn't this child's best interest. The legislature has told you that. The legislature has determined that it is presumed to be in the best interest. The 607 standards should be applied. You shouldn't prevent and rob a child of her natural birth father and all of the entitlements and all of the benefits of that relationship unless you find that there's serious endangerment. I don't think this is a case where you're going to put this child at risk if somehow you think 607 applies, not in the least. Not in the least. I have absolute confidence in the trial court's ability to sort these things out. That's what trial courts do. They separate the wheat from the chaff. They look at things. They determine what's in the interest. But when you create this overwhelming burden that somehow my guy has to come in and I'll prove that, oh my, it's not all of these bad things that are going to happen to her, that's impossible. This is a fellow who should see this child. It should be regulated. It can be determined by the trial court. But the standards here that were established by the 4th District in making the decision are correct. I don't believe for a second what you said here makes sense. 1401 does say relevant standards. Are you really going to say that now we have a statute that talks about the best interest of the child in two separate sections, 602 and 607, and those aren't relevant for determining visitation? How could that be? I can't really see how that could be. Any other questions? All right. Well, thank you very much. I appreciate your time. Thank you. First of all, Your Honors, let me address the statement made by Mr. Martinkus about Steve Taylor doing everything right. This relationship that he wants to talk about between J.W. and himself was less than 19 days. Because if you look at the facts of this case, what happened was in December, December 24, 2008, is when Steve Taylor and Amy introduced Steve Taylor as, this is your real dad. And I think that's the phraseology that was used and it's contained within the transcripts. On January 9th of 2009, Judge issued an order specifically prohibiting Amy from having any contact or promoting the existence of a relationship between Steve Taylor and J.W. So if my math is correct, that's approximately 19 days, but also within those 19 days, my client, and it was over the Christmas holiday, had visitation with the child. So in reality, we're talking about a two-week period out of a child's six-and-a-half-year-old life at that point. Steve Taylor has been doing all the right things. Is that what the statute focuses on? No. It focuses on what effect is the introduction of Steve Taylor as a father, as a biological father, what is that going to have on J.W.? And all the parties agreed and stipulated, you know what, we're going to have an expert here. None of us, well, we're going to rely on this expert to independently evaluate everybody and then let the court know what is the right thing to do. And what Dr. Frye did is she discussed, evaluated, everybody looked at the evidence, and her conclusion was that at this point in J.W.'s life, it was not in her best interest to have Steve Taylor a part of her life. And she was clearly applying 602, correct? She was clearly applying 602. Can I have one more question about the statute? Yes. If Amy had never married, how does the statute work is my question. A man comes in, files a petition, says that I am the natural father, and I would like visitation. Which statute in the Marriage Dissolution Act in terms of visitation versus 602 versus 607 would apply? I say 602 would still apply. Now, because what this court has said, and I say that in the language of J.S.A. and N. Ray, John H., or John N., it says that just because paternity has been established, and that's the whole thing, just does not automatically confer these parental rights. We look to other things to guide the court in what's in the best interest of the child. Can you explain to me how the statute works? A man comes in, files his petition, and there's a judgment under 14. He asks for visitation. What does the court do next? The court has to then conduct a hearing where all the parties, in this case it would simply be the woman and the man, present evidence to the trial court. The trial court then receiving that evidence makes a decision using the standard what is in the best interest of the child. If, in fact... Can you help me with this? So the court says, I'm not going to look at the visitation statute, I'm going to look at the custody statute first, even when there's no request for custody. No, Judge, I'm not saying that. We'll look at the custody statute. It's the visitation. It's simply whether or not visitation should occur, and that issue alone, because there's no decision with respect to custody, is he afforded visitation? Not automatically on a finding of paternity, and there's no dispute that he's the father. The next level is what's in the best interest of the child. So the statute, let's say in my hypothetical, the mother has custody. Correct. The man comes in, says I want a DNA test, I already have had one, judgment of paternity. I want visitation. 607 says a parent not granted custody of the child is entitled to a reasonable visitation. Why doesn't that apply? It doesn't apply in this case. Why does it apply in this case? No, why isn't that the statutory scheme? How does the statute work? Well, Judge, first of all, with respect to the unmarried woman, there has never been an issue of custody litigated because this individual who is now filing for the first time a petition under the Parentage Act has not brought an action for custody. He's only bringing an action for visitation. So any issue with respect to custody occurs later on. If this is a situation, and we're kind of assuming that automatically the provisions of 607 become applicable to a Parentage Act, the cases say that while a Parentage Act adopts some of the factors, guidelines and standards stated in the Marriage Act, the Parentage Act does not incorporate the procedures of the Marriage Act and does not broadly confer on the court the same powers conferred on the court. So therefore, we don't have to consider the Marriage Act because it's not applicable when it comes down to only an issue of visitation brought pursuant to the Parentage Act. We keep on talking about 607A. My position, Your Honor, is this. It only becomes relevant or applicable if the circumstances are that there has been an issue of custody decided between these two people. And one of the things that Mr. Martinkus brought out and he talks about this both parents, what both parents are we talking about? The statute contemplated a male and a female as both parents. Not, as in this case, we have Steve Taylor and Jason Wills were and still are the parents as contemplated by that provision of the statute 602. They're talking about the mother and father and in this case it would have been Jason and Amy. So talking about the involvement of both of these individuals. So 602, when you're talking about the Parentage Act, refers to the best interest of the child and it focuses in on the person bringing the action. Certainly Jason Wills would never be bringing an action to establish a parent-child relationship. It has already been judicially recognized that he's the parent and he has already been, there has already been a finding with respect to custody, certain rights that flowed from that finding, that Amy had that Jason had visitation. So that would be how 607A would be applicable in this case only as it related to Jason, not Steve Taylor. But judges, your honors, I think it's important because I look to the... Counsel? You need to stay with the microphone. I apologize. Once again, going back to the Worthington case, the court tried to distinguish J.W. and they talked about, well there was no delay on the part of Steve in attempting to establish a healthy relationship. They distinguished Worthington by saying, well in that case, the Worthington case, there was only that father was only minimally involved. Where is the involvement in this case of Steve Taylor that raises itself to a level of creating some relationship? And where does the Parentage Act say that we're going to focus in on how quickly the individual ran to establish a parentage? This is a six and a half year old time span and it's sort of like, I believe it was Gagnon, where you had an eight year period and they said, that's certainly too long. So we shouldn't shift the focus to any good things that Steve may have done. It really amounts to what's in the best interest of this minor at this point and whether he should be injected into her life. But the final thing I wanted to say is I believe if you look at Judge Wall's order, a ten page order, was very specific with respect to her findings. And even if this court is going to take a position that serious endangerment should be the standard, the report from Dr. Frye, in my opinion, and I believe in Judge Wall's opinion, sets forth serious endangerment with respect to the psychological and emotional well-being of that child. And who are we to try and second guess Dr. Frye's opinion? But I think that if we... Counsel, your time has expired. I apologize. Thank you, Your Honors, very much. Thank you for your arguments. Case number 114817 N. Ray, the parentage of J.W. as taken under advisement is agenda number 15. Mr. Marshall, the Illinois Supreme Court stands adjourned.